**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

KEVIN MERTZ,                                  :

                          Case No. 3:10-cv-314

         Plaintiff,

                          District Judge Thomas M. Rose
                          Magistrate Judge Michael R. Merz

  -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

         Defendant.          :

## REPORT AND RECOMMENDATIONS

        Plaintiff brought this action pursuant to 42 U.S.C. §405(g) and 42 U.S.C. §1381(c)(3) as it incorporates §405(g), for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

        Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v.*

*Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988); *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984). However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner, supra.* If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion. *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423. To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy. 42 U.S.C. §423(d)(2).

To qualify for supplemental security benefits (SSI), a claimant must file an

application and be an "eligible individual" as defined in the Social Security Act. 42 U.S.C. §1381a. With respect to the present case, eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. §1382(a). To establish disability, a claimant must show that the claimant is suffering from a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §1382c(a)(A). A claimant must also show that the impairment precludes performance of the claimant's former job or any other substantial gainful work which exists in the national economy in significant numbers. 42 U.S.C. §1382c(a)(3)(B). Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits prior to the date that the claimant files an SSI application. *See,* 20 C.F.R. §416.335.

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520. First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1 (1990). If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the

Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff initially filed an application for SSD on December 3, 2002, alleging disability from December 1, 1998, due to diabetes, high blood pressure, and arthritis. *See* Tr. 112-14; 126. The Commissioner denied Plaintiff's application at the initial stage of the administrative process and Plaintiff took no further appeal. (Tr. 157-58).

Plaintiff filed applications for SSD and SSI on February 9, 2005, alleging disability from February 5, 2004, due to diabetes, gouty arthritis, high blood pressure and depression. *See* Tr. 115-17, 407-09; 150. The Commissioner denied Plaintiff's applications initially and on reconsideration. *See* Tr. 81-95, 410-18. Administrative Law Judge Thomas McNichols held a hearing, (Tr. 39-80), following which he determined that Plaintiff was not disabled prior to his fiftieth birthday. (Tr. 21-33). The Appeals Council denied Plaintiff's request for review, (Tr. 6-10), and Judge McNichols' decision became the Commissioner's final decision.

In determining that Plaintiff is not disabled, Judge McNichols found that he met the insured status requirements of the Act through March 31, 2005. (Tr. 24, ¶ 1). Judge McNichols also found that Plaintiff has the severe peripheral neuropathy secondary to non-insulin diabetes or history of alcoholism, obesity, right shoulder arthritis, and possible depression with history of polysubstance abuse, but that he does not have an impairment or combination of impairments that meets or equals the Listings. (*Id.* ¶ 3, Tr. 25, ¶ 4). Judge McNichols found further that Plaintiff has the residual functional capacity to perform a limited range of sedentary work. (Tr. 26, ¶ 5). Judge McNichols then used section 201.21 of the Grid and found that prior to July 11, 2006, there was a significant number of jobs in the economy that Plaintiff was capable of performing. (Tr. 31, ¶¶ 9, 10). Judge

4

McNichols then used section 201.14 of the Grid and found that as of July 11, 2006, when Plaintiff reached his fiftieth birthday, he was disabled. (Tr. 32, ¶ 11). Judge McNichols concluded that Plaintiff was not disabled prior to July 11, 2006, but became disabled on that date, that he was not under a disability at any time through March 31, 2005, and that his history of polysubstance abuse was not a contributing factor material to the finding of disability. *Id.* ¶¶ 12, 13, 14.

The record contains a copy of treating physician Dr. Vosler's office notes, dated October, 1998, to April, 2008. (Tr. 214-30, 333-53, 380-406). Those notes reveal that Dr. Vosler treated Plaintiff for various conditions including diabetes, neuropathy, gout, depression, and high blood pressure. *Id.* Dr. Vosler monitored Plaintiff's blood sugar and prescribed medication. *Id.*

An EMG of Plaintiff's legs performed on February 19, 2003, showed evidence of a sensorimotor polyneuropathy with demyelination and mild axonal injury, moderate to severe in intensity. (Tr. 238).

On March 6, 2003, examining physician Dr. Oza, reported that Plaintiff complained of constant tingling and numbness in his feet which was worse at night, that he was nauseated all the time, felt weak and took two naps during the day. . (Tr. 231-38). Dr. Oza also reported that Plaintiff was six feet tall and weighed 244 pounds, his peripheral impulses were difficult to assess due to hyperesthesia, and that Plaintiff had a porfalis pedis of 1+ bilaterally. *Id.* Dr. Oza noted he was unable to assess a posterior tibial pulse, that Plaintiff's grip strength was strong bilaterally and was symmetrical, his ranges of motion at his wrists and elbows were full but restricted at the right shoulder, and that he noted tenderness on palpation of his dorsolumbar spine. *Id.* Dr. Oza also noted that Plaintiff's ranges of motion at his hips, knees, and ankles were full, his sensory examination to pinprick, touch, and vibration was hyperesthesic in stocking distribution, his ankle jerk was absent,

his knee jerk was 2+, he walked without ambulatory aids, and that he did not favor any particular extremity. *Id.* Dr. Oza opined that Plaintiff's diabetes was not under good control and there was evidence of diabetic peripheral neuropathy with significant pain. *Id.* Dr. Oza also opined that Plaintiff experienced dizziness secondary to autonomic dysfunction related to the diabetes and that he had some arthritis in his right shoulder. *Id.*

In May, 2003, Dr. Vosler noted that Plaintiff reported shoulder and foot pain after falling two weeks earlier. (Tr. 350). An x-ray of Plaintiff's right shoulder x-ray performed on May 30, 2003, revealed post-traumatic arthritis and a hypertrophic bone spur. (Tr. 250).

Consulting physician Dr. Vitols reported on June 11, 2003, that Plaintiff had pain over his right AC joint, his rotation was restricted by 50%, and that there was some relative loss of strength associated with pain and crepitus, but no motor or sensory changes in the arm. (Tr. 251-52). Dr. Vitols identified Plaintiff's diagnosis as degenerative arthrosis of the right shoulder with a cuff tendonosis and he prescribed an anti-inflammatory medication. *Id.* Dr. Vitols recommended that Plaintiff undergo physical therapy, but noted Plaintiff's insurance did not cover physical therapy. *Id.*

On February 10, 2005, Dr. Vosler reported that Plaintiff had decreased sensation, aching, and pain in his feet due to diabetes. (Tr. 344-45). Dr. Vosler also reported that Plaintiff was able to stand/walk for four hours total in an eight-hour work day and for thirty minutes without interruption, lift/carry eleven to twenty pounds occasionally and six to ten pounds frequently, and that he was moderately limited with respect to repetitive foot movements. *Id.* Dr. Vosler further reported that Plaintiff's ability to sit was not affected by his impairments and that Plaintiff was not significantly limited with respect to pushing/pulling, bending, reaching, and handling. *Id.* Dr. Vosler

indicated that Plaintiff was "employable." *Id.*

Dr. Oza examined Plaintiff again on April 12, 2005, and noted that Plaintiff reported that the neuropathic pain in his legs worsened after standing or walking for five to ten minutes, but that sitting was "okay" if he could periodically stretch his legs. (Tr. 253-55).  Dr. Oza also noted that Plaintiff reported he was unable to check his blood sugars because he could not afford the machine he needed to do so. *Id.*  Dr. Oza reported that her examination revealed Plaintiff was seventy inches tall and weighed three hundred-eight pounds, he had diminished peripheral pulses in his legs, decreased sensation below the knees, the reflexes in his lower extremities could not be obtained, that he had decreased hair in lower one-third of both lower extremities. *Id.*  Dr. Oza noted that Plaintiff's grip strength was strong bilaterally and that manipulation, pinch, and fine coordination were normal in both hands. *Id.*  Dr. Oza reported that Plaintiff had diabetic peripheral neuropathy, that his hypertension was under good control, and that his depression was under fair control.  *Id.*

Examining psychologist Dr. Flexman noted on April 14, 2005, that Plaintiff rambled on when speaking, that he reported a history of alcohol problems but stopped using alcohol in 2002, he had used cocaine and hallucinogens in the past, that he had been through multiple treatment programs, and that he was currently smoking marijuana. (Tr. 260-63). Dr. Flexman also noted that Plaintiff graduated from high school, his attention span was fair, his effort was poor, that a reliability of Plaintiff's response style was judged to be optimal, which suggested no malingering and distortion, and that obsessive thinking concerning somatic or other psychological problems was judged to out of proportion with reality and somatization was present. *Id.* Dr. Flexman reported that Plaintiff was oriented, displayed good concentration, his intellectual functioning was judged to be

7

below average, his memory was fair, and that his judgment was fair. *Id.* Dr. Flexman identified Plaintiff's diagnoses as undifferentiated somatoform disorder, depression, NOS, alcohol abuse, current remission, cannabis abuse, continuous, and borderline intellectual functioning. *Id.* Dr. Flexman opined that Plaintiff had slight limitations in his ability to understand, remember, and carry out short, simple instructions, to make judgments for simple work-related decisions, and in sustaining attention and concentration. *Id.* Dr. Flexman also opined that Plaintiff had moderate restrictions in his abilities to interact with others, to respond appropriately to work pressures in a normal work setting, and to respond to changes in the work environment. *Id.*

An EMG performed on June 22, 2005, revealed signs of moderate sensory motor peripheral neuropathy, most prominently demyelinating, with signs of muscle involvement in the distal extremities. (Tr. 264-65). Dr. Pugar, the neurologist who performed the EMG, also reported it was unlikely there was an underlying motorneuron cause for Plaintiff's fasciculations. *Id.*

Plaintiff sought treatment at the neurology department at the Cassano Community Health Center on August 2, 2005, and complained of sharp pain, often at night, twitching in his calves, and foot pain exacerbated by walking and relieved by sitting down. (Tr. 288-89). Consulting neurologist Dr. Cheek reported that Plaintiff's motor strength for hip flexion was 4+/5 on the left side, his sensory examination showed a decreased sensation to pinprick and light touch, and that vibration was decreased in the lower extremities up to the knee. *Id.* Dr. Cheek also reported that Plaintiff's deep tendon reflexes for the Achilles were 1/4 on the right and 0/4 on the left and that he had decreased pulses bilaterally in the lower extremities. *Id.* Dr. Cheek's impressions were diabetic peripheral neuropathy, venous insufficiency, and renal insufficiency. *Id.* Dr. Cheek added new medications and recommended Doppler testing of the legs. *Id.* Subsequent arterial Doppler testing

8

of both legs was normal. (Tr. 297-98).

In September 2005 Dr. Cheek noted that Plaintiff had been "self[-]dosing," taking three to four Klonopin pills rather than the one pill prescribed, to "knock me out." (Tr. 300-03). Dr. Cheek also noted that Plaintiff admitted taking several of his friend's muscle relaxant pills each day. (Tr. 303). Dr. Cheek reported that he discussed at length with Plaintiff the risks of self-dosing. *Id.* Dr. Cheek reported that Plaintiff exhibited some sensory and vascular deficits, but had 5/5 motor strength in both arms and legs, except for 4+/5 strength in his left hip flexors, his reflexes were within normal limits, and his gait was appropriate. *Id.* Dr. Cheek also reported that he discontinued Plaintiff's Klonopin due to his self-dosing and that he also planned to wean Plaintiff off Vicodin. (Tr. 300).

On September 30, 2006, Dr. Vosler reported that Plaintiff was able to stand/walk and sit each for a total of one hour total in an eight-hour work day and for thirty minutes without interruption and lift/carry eleven to twenty pounds occasionally and six to ten pounds frequently. (Tr. 391-92). Dr. Vosler also reported that Plaintiff was moderately limited with respect to repetitive foot movements and pushing/pulling, and was not significantly limited with respect to bending, reaching, and handling. *Id.*

Examining physician Dr. Koppenhoefer noted on March 19, 2007, that Plaintiff was six feet tall and weighed two hundred eighty-eight pounds and that he reported using a cane when walking significant distances. (Tr. 354-62). Dr. Koppenhoefer also noted that Romberg testing was abnormal, that Plaintiff had difficulty maintaining balance with his feet together on quiet standing, his right shoulder showed decreased range on active and passive bases secondary to adhesive capsulitis, his right thumb was unstable at the MP and the metacarpal/carpal joints, his reflexes were

hypoactive, and that his sensation was grossly intact to fine touch. *Id.* Dr. Koppenhoefer reported that Plaitniff's lower extremities reflexes were hypoactive, his sensation to fine touch was decreased in a stocking distribution, and that he had impaired position sense involving the right leg. *Id.* Dr. Koppenhoefer opined that Plaintiff met the Listing in regards to his diabetic polyneuropathy because of the involvement in both legs. *Id.* Dr. Koppenhoefer also opined that Plaintiff had significant and persistent disorganization of motor functioning in his lower extremities and significant arthritic changes involving the right shoulder which resulted in marked limitation of motion in an active and passive basis. *Id.* Dr. Koppenhoefer concluded that the findings in Plaintiff's right, dominant arm would prevent Plaintiff from using it for any type of labor activities on a regular basis. *Id.* Dr. Koppenhoefer opined further that Plaintiff was able to walk less than one city block without rest or severe pain, stand for ten minutes at one time before needed to sit down or walk around, stand/walk less than two hours total in an eight-hour working day, that Plaintiff would need to take unscheduled breaks during a work day due to a decreased ability to concentrate secondary to pain/paresthesias and numbness, and that Plaintiff would miss more than four days of work per month as a result of his impairments or treatment. *Id.*

The record contains treatment notes from Dr. Kaufhold dated October and November, 2007. (Tr. 371-79). Dr. Kaufhold diagnosed Plaintiff with nephrosclerosis due to his past recreational drug use and opined that Plaintiff's prognosis was good if he kept his blood sugar and blood pressure under control. (Tr. 372).

The medical adviser (MA) testified at the hearing that due to Plaintiff's peripheral neuropathy, he experienced significant and persistent disorganization of motor function in two extremities that equaled Listing 11.04B for central nervous system vascular accident as of his 2004

alleged onset date. (Tr. 72). The MA based his opinion on the June, 2005, EMG of Plaintiff's legs. (Tr. 72-73).

Plaintiff alleges in his Statement of Errors that the Commissioner erred by rejecting the MA's opinion and by improperly relying on the opinions of the reviewing physician and treating physician, Dr. Vosler. (Doc. 8). In addition, Plaintiff argues that the Commissioner erred by failing to find that his allegations of disabling pain were entirely credible. *Id.*

"In assessing the medical evidence supporting a claim for disability benefits, the ALJ must adhere to certain standards." *Blakley v. Commissioner of Social Security,* 581 F.3d 399, 406 (6th Cir. 2009). "One such standard, known as the treating physician rule, requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because

> these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone of from reports of individual examinations, such as consultative examinations or brief hospitalizations."

*Id.*, *quoting*, *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544, (6th Cir. 2004), *quoting,* 20 C.F.R. § 404.1527(d)(2).

"The ALJ 'must' give a treating source opinion controlling weight if the treating source opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley,* 581 F.3d at 406*, quoting, Wilson,* 378 F.3d at 544*.* "On the other hand, a Social Security

Ruling[1] explains that '[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.'" *Blakley, supra, quoting,* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996). "If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,*582 F.3d at 406*, citing, Wilson,* 378 F.3d at 544*, citing* 20 C.F.R. § 404.1527(d)(2).

"Closely associated with the treating physician rule, the regulations require the ALJ to 'always give good reasons in [the] notice of determination or decision for the weight' given to the claimant's treating source's opinion." *Blakley,* 581 F.3d at 406, *citing,* 20 C.F.R. §404.1527(d)(2). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Blakley,* 581 F.3d at 406-07,*citing,* Soc.Sec.Rule 96-2p, 1996 WL 374188 at *5. "The *Wilson* Court explained the two-fold purpose behind the procedural requirement:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the

---

FN 1.  Although Social Security Rulings do not have the same force and effect as statutes or regulations, "[t]hey are binding on all components of the Social Security Administration" and "represent precedent, final opinions and orders and statements of policy" upon which the agency relies in adjudicating cases. 20 C.F.R. § 402.35(b).

>agency's decision is supplied. *Snell v. Apfel,* 177 F.3d 128, 134 (2nd Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule."

*Blakley,* 581 F.3d at 407*, citing, Wilson,* 378 F.3d at 544. "Because the reason-giving requirement exists to ensure that each denied claimant received fair process, the Sixth Circuit has held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record.'" *Blakley, supra, quoting, Rogers v. Commissioner of Social Security.,* 486 F.3d 234, 253 (6th Cir. 2007)(emphasis in original).

Judge McNichols based his residual functional capacity on the opinion of Dr. McCloud, who reviewed the record in January 2006 and the February 2005 assessment of Plaintiff's treating primary care physician, Dr. Vosler. (Tr. 27). Plaintiff contends that Judge McNichols should have accorded controlling weight to the MA's opinion that Plaintiff was disabled as of February 1, 2004. (Tr. 72-73). Plaintiff's position is that Judge McNichols failed to follow controlling Sixth Circuit law by not giving controlling weight or complete deference to the MA's opinion.

Contrary to Plaintiff's contention, Judge McNichols' explanation of why he declined to fully accept the MA's opinion was sufficient to show that he evaluated this physician's opinions under the required regulatory factors of supportability and consistency. *See* Tr. 25. Judge McNichols declined to give substantial weight to the MA's opinion because he found the MA was unable to be specific enough with regard to his opinion. *Id.* Judge McNichols further noted that in order to be found disabled under 11.04B, which is contained in 11.00C, very serious symptoms, such

13

as paralysis, involuntary movements, and so forth and "the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms" must be considered. *Id.* The record contains no evidence of very serious symptoms such as paralysis and involuntary movements.

In determining Plaintiff's residual functional capacity, Judge McNichols relied on the assessment of state agency reviewing physician, Dr. McCloud, who found Plaintiff capable of performing lifting in the light category in addition to finding that Plaintiff had the ability to stand/walk at least two hours. (Tr. 325-32). It was not error for Judge McNichols to credit the opinion of the reviewing physician. *See* Social Security Ruling 96-6p ("State agency medical and psychological consultant are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act.").

In addition, Judge McNichols relied on the assessment of Plaintiff's treating physician, Dr. Vosler. Judge McNichols' decision in this regard is supported by substantial evidence. To be afforded controlling weight, the opinion of a treating physician must be well-supported by medically acceptable clinical and laboratory diagnostic techniques, and must not be inconsistent with other substantial evidence in the record. *See, Blakley,* 581 F.3d at 406; 20 C.F.R. § 404.1527(d)(2). In weighing the opinions of the treating physician, Judge McNichols was required to consider factors such as the length, nature and extent of the treatment relationship, the frequency of examination, the medical specialty of the treating physician, the opinion's supportability by evidence, and its consistency with the record as a whole. 20 C.F.R. § 404.1527(d)(2)-(6); *Wilson,* 378 F.3d at 544. Plaintiff argues that the treating physician rule did not apply to Dr. Vosler, because his treatment relationship was questionable. Plaintiff contends he was treated primarily by a physician's assistant, Shelley Barney. Dr. Vosler saw Plaintiff less frequently

14

than the physician's assistant, but he refilled Plaintiff's medication, referred him to specialists and prescribed other treatments consistent with his condition. While the frequency of examination is a factor to consider in weighing the treating physician's opinion, *Wilson*, *supra*, it is disingenuous in this case for Plaintiff to focus on that factor and argue that Judge McNichols should have given less weight to Dr. Vosler while giving more weight to the MA, who never examined Plaintiff.

Plaintiff's reliance on certain objective medical testing to support his position at most shows only a conflict in the evidence, rather than an absence of substantial evidence supporting Judge McNichols' decision. For example, Plaintiff argues that the EMG reports and observations by Dr. Oza, Dr. Cheek, and Dr. Koppenhoefer show diminished sensation and reflexes in his legs and, on occasion, his hands. Judge McNichols, however, considered this objective evidence as indicated by his descriptions of the objective medical evidence, *see* Tr. 24-25. Judge McNichols also acknowledged the abnormal EMG findings, but he also emphasized the absence of serious clinical deficits. (Tr. 28). In addition, Judge McNichols discussed that Dr. Oza's April, 2005, examination findings revealed essentially normal gait without an ambulatory aid, 5/5 muscle strength in all arms and legs, strong grip strength, and normal manipulation and range of motion in the upper body. (Tr. 254-58).

Under these facts, the Commissioner did not err by failing to give controlling or even great weight to the MA's opinion or by crediting treating physician Dr. Vosler's and the reviewing physicians' opinions.

Plaintiff argues next that the Commissioner erred by rejecting his complaints of disabling pain.

In many disability cases, the cause of the disability is not necessarily the underlying

15

condition itself, but rather the symptoms associated with the condition. *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 247, (6th Cir. 2007). Where the symptoms and not the underlying condition form the basis of the disability claim, a two-part analysis is used in evaluating complaints of disabling pain. *Rogers, supra* (citations omitted). First, the ALJ will ask whether there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. *Id.* (citation omitted). Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities, *Id.* Stated differently, there is a two-step process for evaluating pain. First, the individual must establish a medically determinable impairment which could reasonably be expected to produce the pain. *See, Jones v. Secretary of Health and Human Services,* 945 F.2d 1365 (6th Cir. 1991), *citing, Duncan v. Secretary of Health and Human Services,* 801 F.2d 847 (6th Cir. 1986). Second, the intensity and persistence of the alleged pain are evaluated by considering all of the relevant evidence. *See, Jones,* 945 F.2d at 1366-70.

  Although he determined that Plaintiff has severe peripheral neuropathy secondary to non-insulin diabetes or history of alcoholism, obesity, and right shoulder arthritis, Judge McNichols determined that Plaintiff's complaints of disabling pain and limitations were not entirely credible essentially because they are not supported by the record. (Tr. 27, 30 ). This Court agrees.

  As noted above, the clinical notes of Dr. Vosler reveal no evidence of substantial compliance with medications for diabetes, hypertension, the neuropathy, or anything significant finding as to Plaintiff's right shoulder. (Tr. 333-53, 380-406). As Judge McNichols found, Plaintiff visited Dr. Vosler infrequently prior to 2006. In addition, as Judge McNichols noted, there is no

evidence of any therapy or other pain modalities other than Vicodin. (Tr. 27).

Plaintiff also argues that his activities of daily living were limited due to the chronic pain in his lower extremities. However, Judge McNichols did consider his daily activities when determining that he was not entirely credible. The Regulations provide that in assessing credibility, the Commissioner may consider a variety of factors including daily activities. 20 C.F.R. § 404.1529. During the period prior to July 11, 2006, Plaintiff's self-reported activities include cooking food for himself, straightening up the house, playing computer games, visiting and talking with friends and family, and going places with friends and neighbors. (Tr. 26, 29, 261). In December, 2005, Plaintiff's long-time girlfriend reported that Plaintiff fed his dog, washed dishes, went outside every day to check the mail, shopped once a week, and had no problems with personal care. (Tr. 172-79). Those activities are inconsistent with an allegation of total disability.

The Court's duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence. *See, Raisor v. Schweiker,* 540 F.Supp. 686 (S.D.Ohio 1982). The evidence "must do more than create a suspicion of the existence of the fact to be established. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *LeMaster v. Secretary of Health and Human Services,* 802 F.2d 839, 840 (6th Cir. 1986), *quoting, NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939). The Commissioner's decision in this case is supported by such evidence.

It is therefore recommended that the Commissioner's decision that Plaintiff was not

disabled and therefore not entitled to benefits under the Act be affirmed.

March 29, 2011.

*s/ Michael R. Merz*
United States Magistrate Judge

# NOTICE  REGARDING  OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).